125 F.Supp.2d 981 (2001)
In re In the Matter of the Complaints of the AMERICAN MILLING COMPANY, Unlimited, H & H Marine, Inc., and American Milling, L.P., a limited partnership, and Winterville Marine Services, Inc., for exoneration from or limitation of liability, Petitioners.
No. 4:98CV575SNL.
United States District Court, E.D. Missouri, Eastern Division.
January 9, 2001.
Alan K. Goldstein, John R. Halpern, Gary T. Sacks, Daryl F. Sohn, Goldstein and Price, L.C., St. Louis, MO, Thomas P. Germeroth, Gray and Ritter, St. Louis, MO, for the Amercan Milling Co., Unlimited, H&B Marine, Inc., American Milling LP.
*982 John S. Farmer, Suzanne L. Montgomery, Thompson Coburn, St. Louis, MO, William R. Bay, Raymond L. Massey, Michael D. O'Keefe, Sr., Thompson Coburn, St. Louis, MO, for President Riverboat Casinos, Inc.

MEMORANDUM
LIMBAUGH, Senior District Judge.
This matter is before the Court on Claimant President Casinos' motion to compel petitioner American Milling to increase security funds and to deposit proceeds of vessel sale into court (# 845), filed April 2, 1999. Responsive pleadings have been filed. On July 30 and August 27, 1999 an extensive due appraisement hearing was held before this Court regarding the value of American Milling's interest in the M/V ANNE HOLLY on April 4, 1998 pursuant to Rule F(7) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure. Following the completion of this hearing, the parties were granted additional time to submit post-hearing briefs. Such briefs have now been filed and the matter is ready for disposition.
On April 4, 1998 the M/V Anne Holly was involved in a collision with the President Casino on the Admiral while the vessel was moored in the Mississippi River. On April 6, 1998 American Milling, as "owners" of the M/V Anne Holly filed a Complaint for Exoneration from, or Limitation of, Liability, pursuant to 46 U.S.C.App. § 186, regarding this accident. Along with its Complaint, American Milling filed an "Ad Interim Stipulation" purportedly pursuant to supplemental Admiralty Rule F(1) which it believes provides security for the benefit of the numerous claimants involved in this consolidated action. The Ad Interim Stipulation provides that American Milling and its surety St. Paul Fire and Marine Insurance Co. undertake to pay into the court the sum of $1.25 million, as the fair market value of the M/V Anne Holly, "within (10) days after the entry of an Order appraising the amount or value of Plaintiffs' interest in said vessel and her pending freight or will file in this proceeding a bond or stipulation of value therefor, which shall stand as security for all claims in said Limitation proceeding ..." Document # 5, filed April 6, 1998.
On February 3, 1999, approximately ten (10) months after the accident involving the President Casinos, the M/V Anne Holly was sold for $2.2 million. It is no longer moored within the continental United States.
President Casinos contends that the Ad Interim Stipulation does not qualify as one of the three approved forms of security under Rule F(1). It further contends that the recent sale of the M/V Anne Holly for $2.2 million represents the fair market value of the vessel. Thus, it requests that the Court make a "due appraisement" of the vessel, pursuant to Rule F(7), and order American Milling to post cash or a bond as security for $2.2 million as the limitation fund.
American Milling suggests that President Casinos has not properly challenged the form or amount of the security already posted for the limitation fund. It further argues that the amount of the fund must equal the fair market value of the vessel immediately following the casualty, not ten (10) months later. It argues that an "ad interim stipulation" is the widely accepted form of security in limitation proceedings, and that this stipulation for $1.25 million is valid and should remain in effect and force.
Having now conducted a "due appraisement" hearing, the dispute as to the validity of the "ad interim stipulation" is moot. However, it is the regular practice of the courts of the Eastern District of Missouri, Eastern Division to allow the party seeking limitation to file an "ad interim stipulation" until such time the Court either conducts a "due appraisement" hearing or otherwise sets the value of the vessel in question. This Court finds that the "ad interim stipulation" qualifies *983 as "approved security" pursuant to Rule F(1). However, once this Court makes its ultimate determination with regard to the value of the M/V ANNE HOLLY, it will be necessary for petitioner American Milling to deposit into the Court Registry either cash equaling the value of its interest in the vessel (as found by this Court) or post a corporate security bond in the amount of the value of its interest in the M/V ANNE HOLLY.
After careful consideration of all objections to exhibits or testimony taken with the case, all said objections are hereby overruled, and all exhibits and/or testimony offered into evidence at trial are received into evidence. This Court, having now considered the pleadings, the testimony of witnesses, documents in evidence, and filed discovery responses, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
Petitioner American Milling was, during the relevant time-period, the owner of record of the towboat M/V ANNE HOLLY. On April 4, 1998 the M/V ANNE HOLLY was involved in an incident involving the collision of one or more of the barges in its tow with the President Casino on the Admiral while the Admiral was moored in the Mississippi River[1]. On April 6, 1998 American Milling filed a Complaint for Exoneration from, or Limitation of, Liability pursuant to 46 U.S.C.App. § 186 (Limitation of Liability Act) regarding this accident. With this complaint, it filed an affidavit of value attesting that the value of its interest in the M/V ANNE HOLLY was $1.25 million.
The M/V ANNE HOLLY is a 5600 hp open-wheel river inland towboat built in 1973 by Mississippi Marine. At the time of the accident it was approximately twenty-five (25) years old with an average overall useful life expectance of forty (40) years. It had been in continuous operation with average upkeep, including a "repowering" (removal of main propulsion engines and replaced with new ones). At the time of the accident, no major structural changes had been made to it since it was first built.
The M/V ANNE HOLLY had been appraised three (3) times prior to the accident of April 4, 1998. Pete Merrill, a marine broker for over thirty-five (35) years, had been familiar with the M/V ANNE HOLLY since its maiden voyage. On behalf of American Milling, he appraised the vessel for insurance purposes. In March 1995, he set its appraised value at $800,000.00; in February 1996, he set its appraised value at $800,000.00; and in February 1997, he set its appraised value at $1.1 million. On April 5, 1998 (the day after the accident) he set the M/V ANNE HOLLY's appraised value at $1.25 million. At the time of the accident, American Milling had insured the M/V ANNE HOLLY for $1.1 million based upon Merrill's February 1997 appraisement.
Although the M/V ANNE HOLLY was in continuous operation, American Milling was not opposed to selling it for the "right price". In 1997 and 1998, its asking price for the M/V ANNE HOLLY was $2.2 million.[2]
*984 Following the April 4, 1998 accident, the M/V ANNE HOLLY was dry-docked while its future was contemplated. In September 1998, one or more South American entities became interested in purchasing the M/V ANNE HOLLY. Large river inland towboats were of interest to South American buyers because of increasing large soybean and corn crops. Typically, South American buyers begin looking for towboats from September to February for the next harvest season (March to September). American Milling was firm in its asking price of $2.2 million for the M/V ANNE HOLLY. In September 1998, Claudio del Bene (representing Fluviomar S.A.) made a firm offer to buy the M/V ANNE HOLLY for $2.2 million. On November 16, 1998 he and American Milling entered into a "option to buy contract" and Mr. Bene tendered $200,000.00 as consideration for the option contract. On February 2, 1999 the purchase of the M/V ANNE HOLLY was closed for the selling price of $2.2 million. Following its sale, the M/V ANNE HOLLY was delivered to its new owner and presumably is presently navigating the inland river system of South America.
Several towboats ranging in horsepower from 4300 hp. to 6000 hp. were sold during the time-period of 1995-1999. The M/V E. GENE FOURNACE, a 5600 hp. towboat built in 1977, sold in March 1995 for $1.8 million. The M/V WILLIAM GRAYSON, a 6000 hp towboat sold in June 1995 for $2.5 million. The M/V JUDY S, a 4300 hp. towboat built in 1966, sold in March 1998 for $1.1 million. The M/V DEBORAH VALENTINE, a 4300 hp. towboat built in 1963, sold in July 1998 for $1.2 million. The M/V DICK HARBISON, a 4800 hp. towboat built in 1971, sold in December 1998 for $2.2. million. The M/V ANNE HOLLY, a 5600 hp. towboat built in 1973, sold in February 1999[3] for $2.2 million. Finally, the M/V OLINDA C, a 5600 hp. towboat built in 1967, sold in June 1999 for $2 million.
As stated before, at the time of the accident, the M/V ANNE HOLLY was a 25 year old working towboat in satisfactory working condition with a reasonable overall useful life expectancy of 40 years. Thus, this Court finds that she had a remaining useful life of fifteen (15) years based upon the drydock survey and opinion of William Manley. There was no dispute that the replacement cost of the M/V ANNE HOLLY as of April 1998 would have been $6 million less $200,000.00 salvage scrap value, giving the M/V ANNE HOLLY a present replacement cost of $5.8 million. Furthermore, there was no dispute that the average annual depreciation of the M/V ANNE HOLLY would be $145,000.00 per year.

CONCLUSIONS OF LAW
The Limitation of Liability Act provides a procedural tool, which under certain circumstances, permits vessel owners to limit (or even eliminate) their liability resulting from a marine casualty involving their vessel. The Act permits a vessel owner to limit his/her liability in a marine casualty involving multiple claims for damages to the value of the vessel and her freight, so long as the vessel owner is without "privity or knowledge" of the negligence or unseaworthiness (of the vessel) which was the proximate cause of the accident.
The limitation process usually commences with the vessel owner depositing with the court cash, a security bond, or other security (with court approval) equal to the value of the vessel. If any claimant disputes the sufficiency of the "limitation fund", s/he may move the district court to increase the amount of the fund. The district court, after a hearing, may require a modification of the fund amount. See, Luhr Bros., Inc. v. Gagnard, 765 F.Supp. *985 1264, 1268-69 (W.D.La.1991); 46 U.S.C.App. § 185.
A vessel's value, for purposes of determining the amount of the limitation fund, is determined at the end of the voyage during which the casualty occurred. Luhr Bros., at 1268; In the Complaint of North American Trailing Co., 763 F.Supp. 152, 154 (E.D.Va.1991); In re Petition of Banker's Trust Co., 569 F.Supp. 386, 389 (E.D.Pa.1983); see, Norwich Co. v. Wright, 80 U.S.(13 Wall.) 104, 20 L.Ed. 585 (1871). In Standard Oil of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890 (1925), the Supreme Court set forth basic guidelines for ascertaining the value of a vessel for limitation purposes.[4]
According to Standard Oil, supra., the district court should look first at the market value of the vessel. The fair market value is established by evidence of either the actual sale of the vessel or contemporaneous sales of comparable vessels[5]. Id., at 268 U.S. at 155, 45 S.Ct. 465; North American Trailing Co., at 154; Banker's Trust, at 389-90. If no market exists for the vessel or contemporary sales of like vessels are lacking, "other evidence is resorted to". Standard Oil, 268 U.S. at 155, 45 S.Ct. 465; North American Trailing Co., at 155 citing Standard Oil; Banker's Trust, at 390 citing Standard Oil. The court's objective should be to ultimately ascertain the vessel's value by determining the "sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy." Standard Oil, 268 U.S. at 155-56, 45 S.Ct. 465; North American Trailing Co., at 155. Finally, the Court cautioned that "[t]he ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Standard Oil, 268 U.S. at 156, 45 S.Ct. 465; North American Trailing Co., at 155.
If market value cannot be established by contemporaneous sales of comparable vessels, then the district court should look at other indicia of value. See, United States Fire Ins. Co. v. Allied Towing Corp., et al., 966 F.2d 820, 826 (4th Cir. 1992) Determination of value under these circumstances is somewhat flexible, and no single factor should be considered determinative. North American Trailing Co., at 155; Banker's Trust, at 390. "There is no one fixed basis which is decisive where a free and open market for such ships does not exist to establish the fair market value. Rather, the basis of valuation is a composite one which gives an end result in each instance approximating actual value as closely as possible." Banker's Trust, at 390 quoting Ozanic v. United States, 165 F.2d 738, 740 (2nd Cir.1948); see also, Allied Towing Corp., at 826 quoting Ozanic, supra; North American Trailing Co., at 155 quoting Ozanic, supra, in part. Other types of evidence considered by the courts include the opinions of marine surveyors and/or engineers, the costs of reproduction less depreciation, the condition of repair of the vessel in question, insured value of the vessel in question, variety of uses of the said vessel, etc. Carl Sawyer, Inc. v. Poor, 180 F.2d 962, 963 (5th Cir. 1950); see, Allied Towing Corp., at 826 citing Carl Sawyer, supra.; North American Trailing Co., at 155 citing Carl Sawyer, supra.; Banker's Trust, at 390 citing Carl Sawyer, supra. However, such other *986 indicia of value should not be considered unless evidence of contemporaneous sales of comparable vessels is totally lacking. "[W]hen there is evidence of a number of sales on an open market of similar vessels the prices paid would set the limits of valuation to which the court must adhere, and resort to other indicia of value is not warranted." Barton v. Borit, 316 F.2d 550, 553 (3rd Cir.1963) citing Texas Company v. R. O'Brien & Co., 242 F.2d 526, 527 (1st Cir.1957). "Only if it should appear that there was no market [for vessels similar to the Edgar M. Queeny] or there were so few sales of like (ships) that it could not be predicted with any assurance that the prices paid would be repeated in a postulated sale of the (ship) in question, may resort be had to other relevant indicia of value such as replacement cost appropriately deducted." Banker's Trust, at 390 quoting Barton, at 553 (citing United States v. Eastern S.S. Lines, 171 F.2d 589 (1st Cir.1948)).
There was an abundance of evidence of contemporaneous sales of comparable vessels presented to this Court. American Milling asserts that the selling price of the M/V ANNE HOLLY did not reflect its "true" market value because the market had drastically changed from April 1998 to February 1999, thereby, grossly inflating the M/V ANNE HOLLY's market value. It proffers that two other large vessels had selling prices of approximately $1.2 million in 1998. It further contends that Pete Merrill's cost of replacement less depreciation formula and the vessel's insured value at the time of the accident both place the M/V ANNE HOLLY's value at $1.2 million. After careful consideration of the matter, the Court rejects American Milling's assertions and finds that the value of the M/V ANNE HOLLY was its fair market value as reflected by its selling price of $2.2 million.
Evidence set forth before this Court does not suggest that the market had drastically changed between 1998 and 1999, that the M/V ANNE HOLLY's condition was enhanced or improved between the time of the accident and the date of sale, nor that significant circumstances changed during the period between the accident and sale which would have artificially inflated the selling price.
Firstly, the Court finds that sales of the M/V JUDY S. and M/V DEBORAH VALENTINE are not indicative of the value of the M/V ANNE HOLLY because those vessels were much smaller with less horsepower; thus, they are not "comparable vessels". The sales of vessels of comparable size and horsepower ranged all the way from $1.8 million to $2.5 million.
Secondly, the Court finds that the sale of the M/V ANNE HOLLY some 6-10 months after the accident to be its fair market value at the time of the accident. American Milling would have this Court be strictly limited to a value pinpointed to the specific date of April 4, 1998. However, courts have found a vessel's fair market value to be its selling price some months, even years, after an accident. See, In re Union Ferry Co. of New York and Brooklyn, 37 F.2d 95 (2nd Cir.1930) (sale price of vessel in 1922 represented her value on September 16, 1920); The Ethelstan, 246 F. 187 (S.D.Fla.1917) (sale price of vessel sometime after collision found to be value of vessel on earlier date of collision).[6] There was competent evidence that as early as 1997 American Milling had offered the M/V ANNE HOLLY for sale at $2.2 million. There was competent evidence that the market for large towboats had been steadily increasing since 1995. In fact, American Milling had increased the insured value of the M/V ANNE HOLLY approximately $300,000.00 between 1995 and 1997 ($800,000.00 to $1,100,000.00).
*987 Finally, there was no competent evidence that the market had so drastically changed or circumstances had developed which would exaggerate the M/V ANNE HOLLY's selling price. The South American grain harvest season is typically from March through September; therefore, it is customary for South American buyers to look for boats to buy during October through February. There was nothing unusual about the lack of potential buyers in April 1998. There was no evidence that Mr. del Bene was desperate for a large towboat and was willing to pay an inflated price for one. There was no evidence that Mr. del Bene stood to lose significant monies if he did not buy a boat quickly. There was no competent evidence of any "bidding wax" for the M/V ANNE HOLLY which created an artificially inflated price for her. Assuming that there were three (3) potential buyers for the M/V ANNE HOLLY in September 1998 (one of which was Mr. del Bene), American Milling's own evidence was that selling price at $2.2 million was a "firm" selling price not subject to negotiation.
Although this Court finds that the best indication of the M/V ANNE HOLLY's value was its fair market value as evidenced by its sale price of $2.2 million, the Court wishes to also note that even using Mr. Merrill's replacement cost less depreciation formula gives rise to a value of approximately $2,175,000.00. Mr. Merrill and Mr. Manley agreed that the replacement cost of the M/V ANNE HOLLY was approximately $6 million with an annual depreciation of $145,000.00. They further agreed that the ordinary useful life for a towboat such as the M/V ANNE HOLLY is forty (40) years. At the time of the collision, the M/V ANNE HOLLY was twenty-five (25) years old and by all accounts, still is in reasonable maritime shape. Merrill opined that she had a remaining useful life of 8 years. However, Mr. Merrill never inspected her on dry-dock after the accident. Mr. Manley opined that the M/V ANNE HOLLY had a remaining useful life of 15 years following his dry dock inspection of her in January 1999. The Court is inclined to accept Mr. Manley's opinion that the M/V ANNE HOLLY had a remaining useful life of 15 years. Thus, multiplying the average annual depreciation of $145,000.00 by 15 years yields a value of $2,175,000.00 for the M/V ANNE HOLLY on April 4, 1998.
Based upon the Court's foregoing determination of the value of the M/V ANNE HOLLY at the time of the accident, the limitation fund shall be set at $2,200,000.00.
All that remains is the Court's decision as to the method by which American Milling should establish the limitation fund. After careful consideration, the Court finds that in the best interests of the claimants, corporate and individual, American Milling shall be directed to establish the limitation fund by posting either a corporate surety bond in the amount of $2.2 million, or depositing cash into the court registry in the total amount of $2.2 million. The afore-mentioned posting of a corporate surety bond or making of a cash deposit shall be done on or before January 31, 2001.
NOTES
[1] At the time of the incident, the Admiral was moored in a portion of the Mississippi River commonly referred to as the St. Louis Harbor.
[2] At the hearing, American Milling attempted to retract its admission that in 1997 and 1998 its asking price for the vessel was $2.2 million. Affidavits of David Jump and Steve Parsons. However, these affidavits were not filed until the value of the vessel became a hotly contested issue. The Court is more inclined to accept the earlier pre-hearing admission by these persons in American Milling's discovery responses that the asking price for the M/V ANNE HOLLY in 1997 and 1998 was $2.2 million. See, Interrogatory # 11 and answer thereto.
[3] Although the sale on the M/V ANNE HOLLY did not close until February 1999, it was first negotiated in September 1998, with an option of $200,000.00 paid in November 1998.
[4] In Standard Oil, supra, the Supreme Court addressed the issue of valuation of a vessel after a total loss of said vessel. However, the principles set forth in that decision have been found equally applicable to limitation proceedings. See, North American Trailing Co., at 154 n. 1.
[5] In Standard Oil, supra, the Supreme Court defined the concept of "contemporaneous sales" as those sales of "like property in the way of ordinary business, as in the case of merchandise bought and sold in the market". Id., 268 U.S. at 155, 45 S.Ct. 465.
[6] One court has even determined the value of a vessel following a collision on September 13, 1973 to be its sale price in December 1972, ten (10) months prior to the collision. B.F.T. No. Two Corp., 433 F.Supp. 854, 874-75 (E.D.Pa.1977).