# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-3441, 03-3448, 03-3470, 03-3566

_____

| | |
|---|---|
| In the Matter of: The American Milling Company, Limited; In the Matter of: H & B Marine, Inc.; In the Matter of: American Milling, LP, a Limited Partnership, for exoneration from or limitation of liability.[1] | * <br> * Appeal from the United States <br> * District Court for the Eastern <br> * District of Missouri. <br> * <br> * |

_____

Submitted: December 13, 2004
Filed: May 17, 2005

_____

Before MELLOY, BRIGHT, and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

This admiralty case involves numerous appeals and cross-appeals from two district court rulings. In the first ruling, the district court determined that the value of a towboat, the M/V Anne Holly, was $2.2 million. In the second ruling, the district court addressed liability issues surrounding allisions that occurred in the St. Louis harbor when barges from the M/V Anne Holly's tow allided with a pier of the Eads Bridge and a moored gambling vessel, the Admiral. The district court determined that the owner of the M/V Anne Holly and the employer of its crew were entitled to

_____

[1]The complete caption for these consolidated cases is available from the clerk's office.

limit their liability to $2.2 million under the Limitation of Liability Act, 46 App. U.S.C. § 183 et seq. (the "Act"). The district court also determined that the captain of the M/V Anne Holly was competent in general but negligent in this instance and that the allisions resulted from his spontaneous navigational error. Finally, the district court determined that the owner of the Admiral, President Riverboat Casinos, Inc., ("President Casino"), was partially at fault due to its failure to shield or move the Admiral after repeated past allisions at the same location. We reverse the district court's grant of limited liability to the employer of the ship's crew, Winterville Marine Services, Inc. ("Winterville"), because Winterville was not an "owner" as required under the Act. We affirm in all other respects.

I.      Facts

        A.      The Parties and Background Information

American Milling Co., UN Ltd., H & B Marine, Inc., and American Milling, LP (collectively "American Milling") owned the M/V Anne Holly at the time of the allisions. The crew, including the ship's captain, Captain John O. Johnson, were employees of Winterville. Winterville provided the crew for the M/V Anne Holly for $2050 per day under a renewable written contract with American Milling that Winterville and American Milling orally extended each year.

Winterville paid the crew members' salaries and withheld their taxes. Winterville also transported the crew to and from the M/V Anne Holly and provided a telephone, side-band radio, food, and personnel-related supplies. Winterville's crew performed maintenance and repairs as required while the M/V Anne Holly was in service. Winterville did not provide ship-related supplies, parts for repairs, or fuel. Winterville generally made the hiring decisions for the crew but consulted with American Milling before hiring a pilot. American Milling reserved the right to ask Winterville for crew changes or to have crew members removed. American Milling

provided insurance for the vessel and paid for medical expenses associated with crew injuries as well as employee-related maritime maintenance and cure obligations.

Prior to the shipping season, American Milling personnel met with the Winterville crew to discuss repairs and maintenance that American Milling had performed during the off-season. American Milling personnel informed the Winterville crew of navigation conditions, Coast Guard bulletins, and policies and procedures to follow in the operation of the M/V Anne Holly. During the shipping season, American Milling personnel boarded the M/V Anne Holly to talk to the crew and check on the vessel's condition. Also, American Milling personnel were available for the crew to call twenty-four hours a day. American Milling had its own mechanical crews for major overhauls, and between 1997 and 1998 American Milling paid $287,000 for repairs. At least one member of the Winterville crew worked for American Milling during the off-season and helped American Milling with off-season repairs on the M/V Anne Holly. American Milling paid Winterville separately for workers' non-crewing, dry-dock services.

At the time of the allisions, a charter existed between East Side River Transportation ("East Side") and American Milling under which East Side paid American Milling $4000 per day for use of the M/V Anne Holly and its crew. East Side was responsible for all fuel costs, and East Side instructed the crew of the M/V Anne Holly where to pick up and deliver barges. The crew of the M/V Anne Holly maintained event logs to record the time and location of pick-ups and drop-offs as well as any incidents worthy of note. The crew faxed these event logs to Eastside, Winterville, and American Milling on a daily basis. In addition, the crew maintained engine logs that it faxed to American Milling on a daily basis. Notwithstanding these frequent reports, day-to-day navigational decisions rested solely with the crew (other than the selection of destinations to pick up and drop off barges and/or the contents of barges). Eastside and Winterville, like American Milling, were available twenty-four hours a day to take calls from the crew.

President Casino owned the Admiral. Prior to 1985, the Admiral had been an entertainment ship with engines and steering ability. Since 1985, however, the Admiral had been without these capabilities and had been moored at the Missouri shore just downstream of the Eads Bridge. Other vessels or barges had struck the Admiral at least four times at this mooring location between 1985 and 1998.

The Army Corps of Engineers had recommended that President Casino build a protective cell to shield the Admiral from allisions with runaway barges. The district court and parties other than President Casino characterize this recommendation as an order and a condition upon the Admiral's mooring permit from the Corps. President Casino characterizes the recommendation as merely a suggestion. President Casino also argues that the Corps revoked the recommendation after President Casino challenged the recommendation and after the Corps consulted with Coast Guard safety experts. It is undisputed, however, that prior to the accident and prior to the purported revocation of the protective cell recommendation, President Casino represented to the Coast Guard and the Corps that it intended to move the Admiral from its mooring location to a safer area. In fact, the Coast Guard referred to this representation in a letter to the Corps in which the Coast Guard stated that no protective cell was necessary. At a minimum, then, it is clear that the Corps recommended that President Casino build a protective structure and that the absence of official action to follow up on this recommendation was due, at least in part, to President Casino's representation that it would move the Admiral.

B.    Conditions and Navigation on the Mississippi River in St. Louis

The Mississippi River in St. Louis presents many navigational challenges. There are numerous bridges, including the Eads Bridge, that present limited clearance. The river runs generally from north to south, with Illinois on the left descending bank and Missouri on the right descending bank. The river experiences a gradual curve through the area such that vessels moving upstream must turn slightly

to the west as they travel north. The current, which runs down-channel predominantly from north to south, also includes a cross current that moves generally from Missouri toward Illinois. The cross current is more dramatic during times of high water and varies in strength and direction at different locations along the river in St. Louis.

Moving a large tow of barges upstream through St. Louis and under the bridges is somewhat of a balancing act. The downstream current may force a tow of barges that is directed upstream toward either Missouri or Illinois depending on the angle of attack that the pilot presents to the current and the degree to which the generally downstream force of the moving river catches the leading port or starboard edge of the tow. Accordingly, while it might seem logical to assume that a cross current that runs generally toward Illinois would push all tows toward Illinois, this assumption is an oversimplification. Tows of barges are large (in the present case over 1100 feet long); cross currents vary, especially around obstacles such as bridge piers; the river bends slightly near the Eads Bridge; and tows moving upstream at all times face strong resistance from the force of the downstream movement of the water. In other words, although there is a cross current, the water is ultimately moving downstream—not from an origination point in St. Louis, Missouri, to a final destination in East St. Louis, Illinois. The simple fact, as explained below, that the barges from the broken tow in this case drifted toward Missouri rather than Illinois (counter to the direction of the prevailing cross-current) illustrates this phenomenon.

C. The Accident

Early in the morning on April 4, 1998, Captain John O. Johnson, an experienced river boat captain and employee of Winterville, piloted the M/V Anne Holly southbound on the Mississippi River beneath the Eads Bridge in St. Louis, Missouri. He spent most of the day building a tow of fourteen barges, twelve of which were loaded and two of which were empty. The tow measured 1154 feet long

and 105 feet wide.  The towboat, the M/V Anne Holly, measured 154 feet long and 40 feet wide.  The Mississippi River in St. Louis was above flood stage and there was drift (floating debris) present in the river.  The M/V Anne Holly was in proper working condition, other than a faulty tachometer, and had sufficient horsepower to push the tow of barges upstream through the bridges of St. Louis.

At 6:30 p.m., Captain Johnson proceeded northbound.  On this trip, Captain Johnson piloted the M/V Anne Holly under two bridges before he reached the Eads bridge.  The current is stronger at these downstream bridges than at the Eads bridge, and the M/V Anne Holly had no difficulty at either of these bridges.  Captain Johnson spoke on the radio to the captain of a southbound vessel, Captain Simmons of the M/V Frances, and arranged a port to port passing.  Captain Simmons observed the M/V Anne Holly, noted nothing unusual, saw that its lights were functioning, and observed that it was moving at a reasonable speed along a reasonable course.

It is undisputed that Captain Johnson's northbound approach to the Eads bridge was proper at least until the M/V Anne Holly was 400 feet downstream of the bridge.  Experts who testified at trial disagreed as to the precise manner in which a riverboat pilot should proceed from this distance onward, however, at least six seasoned riverboat pilots agreed that Captain Johnson's approach from 400 feet onward was proper.  Captain Johnson approached the Eads Bridge between the center of its center span and the left descending (Illinois side) pier of its center span.  Captain Johnson turned five to ten degrees to port downstream of the Eads Bridge to bring the tow into a position generally perpendicular with the bridge and to drive the tow generally into the current.  At least one expert recommended softer, more gradual, steering at a distance farther downstream from the bridge to more gently bring the tow of barges in line with the current for passing under the bridge.

The President Casino's expert attacked the entirety of Captain Johnson's approach.  This expert opined that it was necessary to approach the bridge nearer to

the right descending (Missouri side) pier of the bridge's center span. This expert also presented an exhibit that showed dramatic cross currents in the area of the Eads Bridge. Other experts, riverboat pilots who relied on personal experience, discredited the approach that President Casino's expert recommended. They also discredited his characterization of the cross currents near the Eads Bridge.

According to Captain Johnson, as he steered the M/V Anne Holly under the Eads Bridge, the vessel and its tow began to experience a vibration. He felt the vibration grow worse and noted that the tow had begun to slow down. He asked his chief engineer to take engine readings using a manual tachometer, as was the general practice in light of the ship's faulty tachometer. The chief engineer did so, and the readings indicated rpms in the appropriate range, which indicated that the engine was generating sufficient horsepower. As a third tier of barges in the M/V Anne Holly's tow passed under the Eads Bridge, the tow stopped its upstream progress entirely and began to move toward the pier on the Missouri side of the bridge's main channel span. Recognizing that an allision with the pier was imminent, Captain Johnson attempted to minimize the impact by landing the tow gently on the pier. Nevertheless, impact occurred with sufficient force to break the tow apart and cause individual barges to top around and float downstream.

Captain Johnson broadcast a "May-Day" signal and radioed the Coast Guard. He also tried to radio the Admiral, but received no response. Captain Simmons, who was farther downstream by this time, heard the distress signal and turned north. As Captain Simmons approached the area, he saw that a barge had allided with the Admiral, the Admiral's moorings had broken loose, and the Admiral had started to move away from the Missouri shore. Captain Simmons radioed Captain Johnson to notify him of the Admiral's condition. Captain Johnson then released the remaining barges from his tow and maneuvered the M/V Anne Holly to secure the Admiral against the shore. The crew of the M/V Anne Holly then boarded the Admiral and

assisted as passengers disembarked the Admiral. Captain Simmons used his own ship to assist with the capture of barges from the M/V Anne Holly's tow.

Following the accident, the National Transportation Safety Board conducted an investigation, and the Coast Guard charged Captain Johnson with negligence. Captain Johnson pleaded no contest to the charges.[2]  Four days after the accident, with no repairs or adjustments made to any equipment on the M/V Anne Holly and with river conditions almost identical to those on the night of the allisions, the M/V Anne Holly successfully pushed a tow of twelve loaded and three empty barges upstream through St. Louis and under the Eads bridge.  On this post-accident run, conducted by Captain Harvey, tachometer readings showed that the engines were operating at the same rpms as on April 4 and that the M/V Anne Holly followed an approach course almost identical to Captain Johnson's April 4 approach.  A videotape of the post-accident run was admitted into evidence.

In November 1998, American Milling received a firm offer of $2.2 million for the M/V Anne Holly from a buyer in the South American inland river towboat market.  In February 1999, ten months after the allisions, American Milling and the buyer closed on the sale of the M/V Anne Holly.  We discuss additional information regarding the value of the M/V Anne Holly below.

D.    Procedural History

On April 6, 1998, American Milling filed a complaint in the district court under the Act asking for exoneration from or limitation of liability against claims that resulted from the allisions.  Normal tort principles of fault and proximate cause apply

---

[2]The District Court excluded certain evidence and testimony that the NTSB and the Coast Guard generated during their investigations.  No parties appeal the district court's evidentiary rulings.

in the maritime setting such that liability requires a showing of fault. Even if a vessel or its crew are negligent or at fault, however, the Act permits owners, owners *pro hac vice*, and certain charterers to limit their liability to the value of their vessel. 46 App. U.S.C. §§ 183, 186. To enjoy a limitation of liability under the Act, such parties must have fulfilled their maritime duty of providing a seaworthy vessel (including a competent crew) and they must not have had knowledge of the negligence or have been in privity with the persons whose negligence or fault actually caused the damage. Id. at § 183. Accordingly, the issues involved in a proceeding under the Act are two-fold. "The court must determine (1) whether negligence or unseaworthiness caused the accident, and (2) whether the shipowner was privy to, or had knowledge of, the causative agent." In the Matter of: MO Barge Lines, Inc. v. Belterra Resort Indiana, LLC, 360 F.3d 885, 890 (8th Cir. 2004).

In its attempt to cap liability under the Act, American Milling asserted that the value of the M/V Anne Holly was $1.25 million. American Milling filed an "Ad Interim Stipulation" which provided that American Milling and its surety would pay into the court or provide a bond for $1.25 million within ten days of the court's entry of a valuation order. President Casino challenged the $1.25 million figure, claimed that the sale price of $2.2 million reflected the appropriate value, requested that the court make findings as to the value of the M/V Anne Holly, and requested that the court require President Casino to pay into the court or post a bond of the value determined.

Winterville later joined American Milling to seek exoneration from or limitation of liability, claiming the status of owner *pro hac vice* due to the level of control that Winterville exercised over the M/V Anne Holly. President Casino later filed a negligence action against Captain Johnson. Winterville, Captain Johnson, and American Milling counterclaimed and alleged that President Casino was at least partially at fault due to its failure to protect or move the Admiral after past allisions with other vessels at the same mooring location. Various other parties including

-9-

barge owners and patrons of the Admiral raised property damage and personal injury claims. Because the issue of limited liability under the Act necessarily required analysis of negligence and fault, the district court consolidated the complaints. The district court separated personal injury claims from property damage claims and addressed only property damage claims in the rulings now on appeal.[3]

In an opinion dated January 9, 2001, following a "due appraisement" hearing, the district court determined that the value of the M/V Anne Holly was $2.2 million. 125 F. Supp. 2d 981 (E.D. Mo. 2001). In reaching this figure, the district court considered the actual sale, contemporaneous sales of similar vessels, prior appraisals of the M/V Anne Holly, and the insured value of the M/V Anne Holly. After arriving at this figure, the district court ordered American Milling to pay $2.2 million into the court's registry or to post a corporate surety bond in that amount.

In a detailed, published opinion dated June 12, 2003, the district court set out the extensive facts of this matter and addressed liability issues. 270 F. Supp. 2d 1068 (E.D. Mo. 2003). The district court concluded under numerous legal theories that Captain Johnson, although a competent and experienced riverboat captain, was negligent on the night in question and at fault for the accident. The district court applied the Oregon rule to reach this conclusion. The Oregon rule is a rebuttable presumption that a moving vessel is at fault if it allides with a stationary object. See The Oregon, 158 U.S. 186, 197 (1895). The district court found this presumption not rebutted. The district court also found under the general negligence principle of res ipsa loquitur that, without negligence on Captain Johnson's part, the accident would not have occurred. The district court also applied the Pennsylvania rule. Under the Pennsylvania rule, if there is a violation of a statute or regulation designed to prevent collisions, the burden shifts to the violator to prove that the violation was

_____

[3]Although we refer only to President Casino throughout, numerous other claimants adopted President Casino's arguments on appeal.

not a contributing cause of the accident. See The Pennsylvania, 86 U.S. (19 Wall.) 125, 129 (1873). The district court found that Captain Johnson violated Inland Navigation Rule 2 by failing to properly consider the strength of the flood-level current under the Eads Bridge. The district court found this presumption unrebutted. Finally, the district court found that Captain Johnson's failure to properly consider the strength of the current comprised negligence under a traditional analysis of duty and breach because failure to properly consider the current fell below the duty of care required of a prudent seaman.

The district court's finding that Captain Johnson was negligent prevented any owner from enjoying exoneration from liability under the Act. The district court determined that Winterville was an owner due to the level of control that the Winterville crew exercised over the M/V Anne Holly. The district court found, however, that the M/V Anne Holly was in good working order, Captain Johnson was competent to pilot the M/V Anne Holly, and neither American Milling nor corporate personnel at Winterville had privity or knowledge regarding Captain Johnson's negligence. In this regard, the district court found that Captain Johnson and the rest of the crew were not sufficiently high in the hierarchy of Winterville's company structure to be considered managing agents whose negligence could be imputed to the company. Accordingly, the district court found that Winterville and American Milling satisfied their duty under the Act by providing a seaworthy vessel and competent crew and found them entitled to limit their liability under the Act.

The district court also found that President Casino failed to comply with a requirement included in the Admiral's mooring permit that called for a protective structure to be built near the bow of the Admiral. Accordingly, the district court found under the Pennsylvania rule that President Casino was partially at fault for allisions that involved the Admiral. Further, the district court found, by applying traditional negligence principles, that President Casino had actual knowledge of four prior allisions between runaway barges and the Admiral at the same mooring location

-11-

and that President Casino's failure to take protective action comprised negligence under the circumstances. Finally, the district court assessed President Casino's fault at 20%.

On appeal, American Milling, Winterville, and Captain Johnson contest the district court's valuation determination. Winterville and Captain Johnson contest the finding that Captain Johnson was negligent. President Casino contests the district court's determination that Winterville was an "owner" with standing to seek limited liability under the Act and the determination that Winterville and American Milling were entitled to limited liability under the Act. In this regard, President Casino specifically contests: (1) the finding that Captain Johnson was competent and that provision of a competent crew entitled owners to limited liability under the Act; (2) the finding that Captain Johnson was not a managing agent for Winterville; and (3) the finding that American Milling and Winterville were without negligence and did not have privity or knowledge concerning Captain Johnson's negligence. Finally, President Casino contests the district court's assessment of 20% fault for failure to protect the Admiral.

II.     Jurisdiction and Standards of Review

28 U.S.C. § 1292(a)(3) provides our jurisdiction over interlocutory appeals in admiralty cases. No party disputes our jurisdiction over appeals from the district court's June 12, 2003 liability determination. President Casino, however, argues that we are without jurisdiction over appeals from the district court's earlier, January 9, 2001 valuation determination because no party filed a notice of interlocutory appeal within thirty days of the court's entry of that order. In this regard, President Casino correctly notes that 28 U.S.C. § 2107(a) permits only thirty days for the filing of a notice of appeal. Id. ("no appeal shall bring any judgment, order or decree . . . before a court of appeals for review unless notice of appeal is filed, within thirty days after the entry of such judgment, order or decree").

-12-

In this instance, however, because there had been no finding of liability, the valuation determination by itself was not appealable at the time of entry. Without a later determination as to liability, the valuation determination was strictly a finding by the district court regarding the amount to be paid into the court's register or to be posted as bond. Such an order is not independently appealable. City of Fort Madison, Iowa v. Emerald Lady, O.N. 972894, 990 F.2d 1086, 1089 (8th Cir. 1993), (there must be "a decision on the merits of the claims or defenses underlying the dispute as a predicate for jurisdiction."). The finding of liability in the June 12, 2003 order made the earlier order appealable. Accordingly, the notice of appeal was timely and jurisdiction is proper.

Because jurisdiction is proper, we may review the merits of the claims raised on appeal. We review the district court's factual findings following a bench trial in admiralty for clear error. McAllister v. United States, 348 U.S. 19, 20 (1954). Findings of negligence in admiralty are findings of fact. Lone Star Indus. v. Mays Towing Co., 927 F.2d 1453, 1456 (8th Cir. 1991). In admiralty as in other contexts, however, we review purely legal determinations de novo. In re: MO Barge Lines, Inc., 360 F.3d at 889; Union Pacific R.R. Co. v. Kirby Inland Marine, Inc., of Miss., 296 F.3d 671, 674 (8th Cir. 2002).

III.    Discussion

A.    Winterville's Status as an Owner

The Act provides limited liability to the "owner" of a vessel who does not have privity or knowledge regarding the negligent acts that caused damage. 46 App. U.S.C. § 183. The Act also applies to a charterer who "shall man, victual, and navigate such vessel at his own expense, or by his own procurement." Id. at § 186. The Act, however, specifically excludes from coverage a ship's crew and master,

even if the crew or master happens also to be an owner.  Id. at § 187.  Section 187 provides:

> Nothing in sections . . . 183 . . . and 186 of this title shall be construed to take away or affect the remedy to which any party may be entitled, against the master, officers, or seamen, for or on account of . . . any negligence . . . or other malversation of such master, officers, or seamen . . . nor to lessen or take away any responsibility to which any master or seaman of any vessel may by law be liable, notwithstanding such master or seaman may be an owner or part owner of the vessel.

Courts have expanded the definition of owner or charterer to encompass parties in analogous situations who exercise dominion and control over a vessel and are therefore owners *pro hac vice* even if not technically charterers.  See  Petition of the United States, 259 F.2d 608, 609 (3d Cir. 1958) (noting that the words "charter" or "charter party" need not be present in a contract in order for the person taking over the operation of the ship to be considered a charter party or temporary owner); see also In re Complaint for Exoneration From or Limitation of Liability of Shell Oil Co., 780 F. Supp. 1086, 1089-90 (E.D. La. 1991) ("The rule that emerges from all of the cases interpreting ownership pursuant to Section 183 is that if the plaintiff in limitation may be held liable because of his ownership or control of the vessel, then he can maintain a limitation action.").  The question in general, then, is whether a party who claims the status of owner exercised sufficient dominion and control over the vessel to be an owner *pro hac vice* even though neither technically a title-holding owner nor a charterer.  Section 187 makes clear that, when conducting this analysis, we should not ascribe owner status to a party merely based on the fact that it performed functions of master or crew.

Winterville notes correctly that Congress passed the Act to provide an organized mechanism for distributing limited funds among numerous victims, to encourage investment in shipping, to promote shipping as a means of commerce, and

to level the playing field between domestic and foreign shippers by giving domestic shippers the same protections that other nations provided to their own merchant fleets. Coryell v. Phipps, 317 U.S. 406, 411 (1943); American Car & Foundry Co. v. Brassert, 289 U.S. 261, 263 (1933); Flink v. Paladini, 279 U.S. 59, 62 (1929). Winterville argues that these underlying purposes should cause us to interpret the Act liberally in favor of finding owner status. See Coryell, 317 U.S. at 411 ("That construction stems from the well settled policy to administer the statute not with a tight and grudging hand but broadly and liberally so as to achieve its purpose to encourage investments in shipbuilding and to afford an opportunity for the determination of claims against the vessel and its owner.") (internal citations and quotation marks omitted).

The Act, however, is an abrogation of the common law, and it forces individual victims, rather than society in general, to bear the cost of promoting shipping. The Court so noted when it stated:

> While, from the universal habit of insuring vessels, the application of the statute probably results but rarely in an actual injustice to the owner of the injured vessel, yet, being in derogation of the common law, *we think the court should not limit the right of the injured party to a recovery beyond what is necessary to effectuate the purposes of [C]ongress.*

The Main v. Williams, 152 U.S. 122, 132-33 (1894) (emphasis added). See also Hercules Carriers, Inc. v. Claimant State of Florida, 768 F.2d 1558, 1564-65 (11th Cir. 1985). In Hercules Carriers, the Eleventh Circuit noted that the state of affairs of the shipping industry in 1851, when Congress passed the Act, was not necessarily the same as it is today. Hercules Carriers, 768 F.2d at 1564. Further, rather than pushing costs onto individual victims, it is common today for Congress to provide public subsidies when it wishes to aid industries. Id. We must, therefore, be cautious

in our application of the Act to ensure that we honor Congressional intent without unduly limiting victims' recovery.

A number of cases provide examples of when courts have and have not found sufficient control for there to be statutory "ownership." In Petition of the United States, 259 F.2d at 610, the Third Circuit found owner status for a contractor who not only provided a crew, food, and personnel-related supplies for a government-owned vessel, but who also provided fuel, controlled navigation, insured the vessel, and agreed to return the vessel to the government in a certain condition. The contractor who sought a limitation of liability did not merely hire the crew, but rather exercised complete dominion over the vessel as evidenced by the fact that the contractor was ultimately responsible for the vessel's condition.

Similarly, in Chesapeake Shipping, Inc. v. Gleneagle Ship Mgmt. Co., 803 F. Supp. 872, 873-75 (S.D. N.Y. 1992), the court found "owner" status for a company that "took over the full management and operation of the vessels." Id. at 873. The company that sought limited liability not only provided the crew and crew-related supplies, but also provided engine supplies, controlled maintenance and repairs, and provided parts. Also, the company had entered an agreement with the owner that provided, "To the extent permitted by applicable law, [the] [o]wner shall have no liability for personal injury claims relating to the [v]essels . . . [and the company] shall process all personal injury claims relating to the [v]essels." Id.

Again, in Complaint of B.F.T. No. Two Corp., 433 F. Supp. 854, 871-73 (E.D. Pa. 1977), the court found owner status for a contractor that, under oral agreement, provided a crew and insurance and also arranged for business on behalf of the owner to ensure that the vessel remained gainfully employed and in service. The contractor received a fee from the owner based on the income generated by the vessel during the period of the agreement. These facts described a contractor that was more similar to a charterer than to a company that merely provided crewing services. Because the

-16-

contractor was responsible for insurance as well business, it was clear the contractor was responsible for making decisions above and beyond those normally entrusted to a captain or pilot.

In contrast, the court in Oil Spill By The AMOCO CADIZ, 954 F.2d 1279, 1302 (7th Cir.1992), denied owner status to a management company that assisted with the maintenance and operation of a vessel but was not ultimately responsible for operation, maintenance, or repair of the vessel or responsible for the training of the crew. In this Seventh Circuit case, the vessel's titled owner entered a "Consulting and Chartering Agreement" with the management company under which the management company was designated as an agent of the titled owner and under which "[o]nly the titled owner had the requisite degree of possessory, managerial, and operational control of [the vessel]." Id. at 1302-03 (internal quotation marks omitted).

Similarly, in Birmingham Southeast LLC v. M/V Merchant Patriot, 124 F. Supp. 2d. 1327, 1338-39 (S.D. Ga. 2000), the court found that a contractor did not qualify as an owner where there was an oral management agreement, the contractor hired and managed the crew, but the contractor did not pay the crew's wages or the expenses of operation and maintenance of the vessel. In Birmingham Southeast, the contractor was in constant contact with the vessel's titled owner regarding all aspects of operation including the crew and the vessel and oversaw maintenance and prepared maintenance budgets, but the title owner approved and paid for maintenance expenditures. Also, the contractor "was not a charterer of the vessel and was not involved in the commercial aspects of which ports the vessel called at and what cargoes she carried." Id. at 1330.

Turning to the present case, we find that the district court's factual determinations are supported by the record. We believe, however, that these facts establish that the present case is more akin to Birmingham Southeast and Oil Spill By

-17-

The <u>AMOCO CADIZ</u> than to the previously cited cases. Accordingly, we are compelled to find that Winterville does not enjoy ownership status under the Act. As explained below, Winterville's role under the crewing agreement was limited and kept in check by American Milling's retention of substantial control over decisions related to the operation and control of the vessel, selection of the crew, and maintenance of the vessel.

Regarding operation and control of the vessel, Winterville left daily navigation decisions to the crew and captain. Such decisions included how to arrange the barges within the tow, when to use helper tugs, and judgment calls regarding the safety of proceeding in light of river conditions. Winterville transported the crew to and from the vessel, provided the crew with radio equipment, food, and personnel-related supplies, and was available for the crew to contact while the vessel was in service. However, the crew was also in contact with American Milling and Eastside. All three of these entities received daily pilot house logs, and American Milling also received daily engine logs. Eastside, not Winterville, controlled the ship's destinations and provided the fuel. As such, Winterville was wholly uninvolved with "the commercial aspects of which ports the vessel called at and what cargoes she carried." <u>Id.</u>

American Milling personnel met with the crew before the start of the towing season to inform the crew of navigation conditions existing in the area and bulletins from the Coast Guard. American Milling also dictated aspects of operation when it met with the crew to inform the crew of "any changes in operating policy and procedures." Further, American Milling reserved the right to board the vessel at any time, and American Milling personnel historically had boarded the vessel during the towing seasons to check on the crew and the condition of the ship.

American Milling also retained substantial control over hiring decisions. Under a written management agreement that was orally extended each year, Winterville selected the crew, paid the crew, and withheld taxes. American Milling,

however, retained the right to demand crew changes and the right to approve or disapprove the hiring of a captain. American Milling, therefore, retained ultimate authority over selection of the captain and composition of the crew. Further, American Milling agreed to bear responsibility for the cost of crew injuries and the cost of maritime maintenance and cure obligations. In short, the record supports the conclusion that Winterville was the employer of the crew. Winterville, however, was not completely or solely responsible for hiring and managing the crew.

Regarding maintenance of the vessel, American Milling maintained insurance on the vessel, Winterville did not agree to return the vessel in any certain condition, and American Milling, not Winterville, was ultimately responsible for all repairs. Although Winterville's crew did perform maintenance as necessary while the vessel was in service, American Milling had its own mechanical crews for major overhauls. Between 1997 and 1998 American Milling paid $287,000 for repairs. There is no evidence to support the conclusion that Winterville paid for any repairs, insured the vessel, or agreed to return the vessel in a certain condition. The fact that American Milling personnel met with the crew at the start of the shipping season to inform the crew of maintenance and repairs that American Milling performed during the off-season highlights this fact.

Participation by some Winterville employees in some of American Milling's drydock repairs does not lend support to a finding of owner status. Winterville's employees that assisted with drydock repairs did so outside the context of the crewing agreement, and Winterville billed American Milling separately for these separate services. We do not believe that a labor firm attains owner status under the Act by contracting separately with the owner of vessel to have a laborer perform repair work.

In conclusion, we believe the district court's factual findings regarding the apportionment of duties between Winterville and American Milling, as set forth in the district court's express findings of fact, are supported by the record. See 270 F.

-19-

Supp. 2d at 9-11. The ultimate conclusion of ownership status, however, must be resolved against finding Winterville to be an owner, owner *pro hac vice*, or charterer. Winterville's role in the present case was limited in same manner that the contractor's role was limited in <u>Birmingham Southeast</u>. Winterville did not have an investment in the ship, and Winterville contractually limited its obligations regarding the ship. American Milling simply did not relinquish sufficient control to Winterville to impart owner status.

B.      Negligence of Captain Johnson and Privity with American Milling

As an initial matter we note that President Casino urges us not only to affirm the district court's finding that Captain Johnson was negligent in this instance, but to hold that he was so incompetent that American Milling cannot be said to have met their duty of fielding a competent crew. All arguments in this regard are without merit. Captain Johnson had extensive experience on the Upper Mississippi River under all conditions with the M/V Anne Holly and similar vessels. His career of more than thirty years involved only one prior accident, and that accident was attributable to mechanical failure. He had piloted the M/V Anne Holly and other vessels pushing similarly sized tows both directions under the Eads Bridge without incident in high water and in normal conditions. His approach to the Eads Bridge was consistent with the approach recommended by a majority of the experts who testified at trial, and whose testimony we find no reason to doubt. Further, Captain Johnson's actions to secure the Admiral following the allisions attest to his skill as a pilot. Captain Johnson was not incompetent.

Turning, then, to the issues of negligence and fault, we first address the Oregon rule. The Supreme Court stated that a moving vessel can rebut the Oregon rule presumption "only . . . by clear proof of a contributing fault." <u>The Oregon</u>, 158 U.S. at 197. "The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled

-20-

in some way." Wardell v. Nat'l Transp. Safety Bd., 884 F.2d 510, 512 (9th Cir. 1989). Other circuits have expanded upon the Supreme Court's limited statement regarding contributing fault to hold that a moving vessel may rebut the presumption of negligence by proving that (1) the moving vessel used all reasonable care to avoid the collision and was therefore without fault, (2) the stationary object was at fault, or (3) the allision occurred because of an "inevitable accident." Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir. 1977); see also Bunge Corp v. Freeport Marine Repair, Inc., 240 F.3d 919, 923 (11th Cir. 2001).

In an attempt to rebut the presumption in this case, Winterville and Captain Johnson argue that drift collected and built up in flanking rudders or struts forward of the M/V Anne Holly's propellers and caused the M/V Anne Holly to stall out. Captain Johnson and Captain Simmons testified at trial that drift was present in the river on the night of the allisions. There was no evidence, however, to suggest that the drift they observed in the river obstructed the M/V Anne Holly or was the cause of the M/V Anne Holly's loss of forward progress. The district court determined that Winterville and Captain Johnson had presented only a theory rather than evidence and that their theory was insufficient to rebut the presumption under the Oregon rule. We agree. As stated by the district court:

> American Milling, Winterville and Capt. Johnson have failed to rebut the Oregon rule presumption of negligence. They simply have failed to put forth any affirmative evidence that drift caused the allision with the Eads Bridge. It is a huge leap of speculation to go from sighting drift in the river to the M/V Anne Holly's engines stalling and the tow hitting the bridge. Such speculation is not sufficient to carry the heavy burden of proof necessary to show that the allision of the M/V Anne Holly with the Eads Bridge was an "inevitable accident."

270 F. Supp. 2d at 1091.

On appeal, Winterville and Captain Johnson rely on a Third Circuit case, Pa. R.R. Co. v. S.S. Marie Leonhardt, 320 F.2d 262, 264 (3d Cir. 1963),which held that the Oregon rule relates merely to the burden of persuasion such that the presumption disappears as a matter of law when both parties present evidence regarding events prior to the allision. Reliance on Pa. R.R. is misplaced in this case. Even if the Third Circuit's approach is correct, it remains necessary for the moving vessel to present evidence, not merely speculation to counter the presumption. As noted by the Seventh Circuit, whether we treat the presumption of the Oregon rule as one related to the burden of proof or the burden of persuasion, it "must be applied in a 'common sense' manner that is rooted in 'logic and experience.'" Folkstone Marine Ltd. v. CSX Corp., 64 F.3d 1037, 1050 (7th Cir. 1995) (quoting Bunge Corp., 558 F.2d at 794). Common sense application of the rule demands that rebuttal entail, at a minimum, evidence sufficient to establish some cause other than negligence by the crew. The district court did not clearly err by finding that Captain Johnson was presumptively at fault under the Oregon rule.

In the context of this complaint under the Act, our analysis does not end with application of the Oregon rule. Instead, it is necessary to identify with more particularity the negligent acts that proximately caused the allisions. This is necessary because we must determine whether such acts may be imputed to the American Milling as the owner of the M/V Anne Holly due to privity or knowledge, or whether the negligent acts were attributable only to the crew.

In addition to Captains Johnson and Simmons, several other seasoned riverboat pilots testified that, based on their own experience, Captain Johnson employed a proper approach to the Eads Bridge. The district court reviewed this testimony, evidence surrounding the physical condition of the M/V Anne Holly prior to the allisions, evidence surrounding Captain Johnson's communications with other vessels prior to the allisions, and the tape of the post-accident run under the Eads Bridge. The district court determined, as a factual conclusion, as follows:

-22-

The preponderance of credible evidence at trial was that Capt. Johnson underestimated the strength of the current as he headed under the bridge, the tow began to move too far toward the left descending pier and he was unable to compensate for it. The strength of the current and the need to steer properly to compensate for it is clearly shown in Exhibit 80 (the video of the M/V ANNE HOLLY's April 8, 1998 northbound voyage through the St. Louis Harbor). The Court concludes that the allision of the M/V ANNE HOLLY was the result of a navigational error by Captain Johnson. As such, Capt. Johnson has failed to overcome the presumption of fault pursuant to the Oregon rule.

270 F. Supp. 2d at 1096.

The only arguments offered to attack this finding fall far short in light of the applicable, clear error standard. President Casino argues, essentially, that Captain Johnson completely misunderstood the nature of the currents near the Eads Bridge and that the district court was wholly mistaken regarding the flow of water in the Mississippi River in St. Louis. There is simply a dearth of evidence to support this or other alternative theories. As already noted, the theory of collected drift relied on speculation. The ship was in good working order. Also, experts whom the district court accepted as credible all attested to the general propriety of Captain Johnson's approach and the general impropriety of the approach recommended by President Casino. The district court dismissed President Casino's description of currents at the Eads Bridge because President Casino's expert did not form his opinion based on personal experience whereas the balance of experts testified based on years of experience surrounding the same river location. Because the district court's findings in this regard clearly rest on credibility determinations and on assessments of the relative merits of the parties' opposing theories as to the cause of the accident, we do not lightly inject our own views into the mix. We find no clear error.

As to the issue of privity, we also find no clear error. "Privity generally means some personal participation of the owner in the fault or negligence that caused or

-23-

contributed to the loss or injury." In the Matter of: MO Barge Lines, Inc., 360 F.3d at 890-91. There is no evidence to suggest that American Milling personnel controlled the manner in which Captain Johnson maneuvered the M/V Anne Holly on April 4, 1998, nor that it was their duty to do so. Because we hold that Winterville is not an owner, we need not address the issue of privity between Winterville and Captain Johnson.

In its brief, President Casino itself recognized that spontaneous or momentary errors by competent pilots cannot be imputed to owners. See President Casino's Brief at 56-57 ("In other words, if the pilot was well-trained and competent, and, for some reason that could not have been anticipated by the shipowner, made a maneuvering error or some other mistake that was tantamount to a momentary error, the shipowner might have a legitimate claim to limitation of its liability."). President Casino contends, however, that American Milling failed to prove a lack of knowledge or privity because it failed to adequately train Captain Johnson and failed to take adequate steps to educate Captain Johnson concerning currents in the river. This argument rests entirely on the presumption that Captain Johnson was incompetent and that the district court erred when it found that he merely committed a spontaneous navigational error. Because we hold that this earlier finding was not error, President Casino's arguments regarding privity necessarily fail.

C.    Negligence of President Casino

When multiple parties bear responsibility for damages that result from an allision, it is proper to allocate liability according to fault. United States v. Reliable Transfer Co., 421 U.S. 397, 411 (1975); Ark. State Highway Comm'n v. Arkansas River Co., 271 F.3d 753, 759 (8th Cir. 2001). Here, the district court determined that when President Casino received its permit from the Army Corps of Engineers to moor the Admiral to the Missouri bank at the location downstream of the Eads Bridge, a condition of the permit required President Casino to build a protective cell. The

district court further determined that since President Casino failed to build such a cell for the Admiral, President Casino was in violation of a safety requirement of the permit and therefore presumptively at fault under the rule. See The Pennsylvania, 86 U.S. (19 Wall.) at 129.

President Casino argues that the requirement to build a cell was merely a suggestion, as evidenced by letters from President Casino contesting the cell requirement and as evidenced by the fact that the Corps never followed through to demand construction of the cell after receipt of the letters. President Casino also cites technical opinions from the Coast Guard in which the Coast Guard advised the Corps that cells were not necessary. President Casino argues further that a single protective cell would not have afforded meaningful protection from a runaway tow of barges. Finally, President Casino argues that had it applied to the City of St. Louis for a permit to build a cell, any such application would have been denied.

President Casino's arguments in this regard are dubious at best. It is clear that President Casino told the Coast Guard and the Corps that it intended to move the Admiral from the dangerous location. The Corps referenced these representations as reasons for not enforcing the cell requirement, and the Coast Guard referenced these representations as reasons for not recommending installation of protective cells. In essence, President Casino avoided full development, or enforcement, of the cell requirement by promising to move. It is disingenuous for President Casino to now argue that these authorities, which relied on such promises, felt no cells were necessary. Further, President Casino never applied for a permit from the City of St. Louis. Accordingly, there is no evidence of the claimed impossibility of obtaining a building permit

Regardless, however, we need not resolve all disputes concerning the status of the permit and the Pennsylvania rule. Normal principles of negligence as well as maritime presumptions apply in the present context, and the district court also

concluded that President Casino was at fault for failing to exercise ordinary care. As noted by the district court:

> Even if the Court were to view [the Corps'] letter as merely suggesting the erection of a protective cell (which the Court does not), President Casino was still obligated to assess the risk of allision with one or two drifting barges in high water and give meaningful consideration to the Army Corps of Engineers' concerns. There is no credible evidence before this Court that demonstrates that such a prudent review was ever undertaken. . . . Ordinary standard of care dictates that the Army Corps of Engineers' "suggestion" of a protective cell should have been taken.

270 F. Supp. 2d at 1107.

In this regard, we note that runaway barges struck the Admiral four times between 1985 and 1998, the Admiral was moored near a busy and dangerous shipping channel, and the Admiral represented a substantial monetary investment. More importantly, the Admiral carried a large number of passengers during peak hours, making the potential harm of an accident extraordinary. Under such conditions, we cannot say that the district court clearly erred by finding a duty to exercise ordinary care, assess the risk of allision, and comply with "suggestions" for protective cells. This is especially true in light of President Casino's own recognition of the need to move the Admiral, as represented to the Coast Guard prior to the April 4 allision. The district court did not in its apportionment of liability to President Casino.

D.     Value of the M/V Anne Holly

The district court's valuation determination is a factual finding that we review for clear error. Where credible evidence supports a range of values, it is not clear error for a finder of fact to select a value at or near the top of that range. Here the district court considered a great deal of evidence regarding value. American Milling

had the M/V Anne Holly appraised in 1995, 1996, 1997, and 1998 for $800,000, $800,000, $1.1 million, and $1.25 million, respectively. American Milling insured the M/V Anne Holly for $1.1 million in 2001. American Milling personnel admitted that the M/V Anne Holly was always for sale for the "right price" and that in 1997 and 1998, the asking price was $2.2 million. Evidence of sales of similar vessels ranged from $1.2 million to $2.5 million between 1995 and 1999. The lower prices from the comparable sales were for smaller vessels with less horsepower than the M/V Anne Holly and the higher prices for comparable sales were for more comparable vessels. Ultimately, American Milling sold the M/V Anne Holly to a South American buyer for $2.2 million. The $2.2 million figure that the district court adopted was adequately supported by this broad array of evidence.

American Milling argues that the $2.2 million sale price was not evidence of value at the time of the allisions because the market for similar vessels changed dramatically between the time of the allisions and the time of the sale. American Milling argues that bumper crops in South America dramatically increased riverine shipping demand in South America and caused South American interests to enter the market for North American riverine vessels. American Milling argues that this superheated South American riverine market drove prices higher in North America such that the value of the M/V Anne Holly increased during the period of time between the allisions, April 4, 1998, and the sale, February 3, 1999. In essence, American Milling argues that the sale was too remote in time to be considered as evidence and that the sale occurred in the context of a dramatically changed market.

While American Milling correctly notes that the value we must consider is the value of the M/V Anne Holly following the accident, we reject American Milling's argument that the district court's valuation of $2.2 million was clear error. First, American Milling exaggerates the length of time that elapsed between the allisions and the sale. American Milling characterizes the sale for $2.2 million as having taken place on February 2, 1999. That date, however, was merely the date on which

American Milling closed the sale to the South American buyer. The initial offer of $2.2 million occurred in November 1998 when American Milling and the buyer entered a $200,000 "offer to buy" contract. Informal discussions prior to that time suggested a $2.2 million sale price. The fact that closing occurred ten months after the allisions does not change the fact that a willing buyer, in an arm's length transaction, set the price much sooner.

Second, while there may be an outside time limit beyond which evidence of a subsequent sale ceases to be evidence of value on a prior date, we need not identify that limit in this case. For an item such as a ship, with substantial useful life remaining for the production of income over many shipping seasons and, in fact, many years, seasonal fluctuations in price are not as critical as for fungible, bulk commodities, like grain or produce, that are traded widely on instant markets with well established seasonable fluctuations in price.

Finally, and most importantly, even if we were to disregard evidence of the actual sale price, the balance of the record is sufficient to support the district court's findings. In particular, the district court's final determination of $2.2 million placed the value of the M/V Anne Holly well within the range of values reported for comparable sales.

IV.  Conclusion

We hold that Winterville is not an owner entitled to limited liability under the Act, but affirm the judgments of the district court in all other respects and remand for further proceedings consistent with this opinion.

───────────────────────────